# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

YENIER CARDENTEY,

      Petitioner,

v.                                Case No. 3:21-cv-1262-TJC-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
and FLORIDA ATTORNEY GENERAL,

      Respondents.

_____

# **ORDER**

## I.   **Status**

Petitioner, an inmate of the Florida penal system, initiated this case by filing a counseled Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. Doc. 1. He is challenging a state court (Clay County, Florida) judgment of conviction for racketeering, conspiracy to commit racketeering, burglary of a structure with damage in excess of $1,000.00, and grand theft over $100,000.00. He is serving a twenty-five-year term of incarceration. Respondents have responded. See Doc. 7; Resp.[1] Petitioner replied. See Doc. 15. This case is ripe

_____

[1] Respondents have filed several exhibits to the Response. See Docs. 8-1 to 8-25. The Court cites the exhibits as "Resp. Ex." For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

for review.[2]

## II.    **Governing Legal Principles**

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter,

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is

unaccompanied by an explanation,

> the federal court should "look through" the unexplained
> decision to the last related state-court decision that
> does provide a relevant rationale. It should then
> presume that the unexplained decision adopted the
> same reasoning. But the State may rebut the
> presumption by showing that the unexplained
> affirmance relied or most likely did rely on different
> grounds than the lower state court's decision, such as
> alternative grounds for affirmance that were briefed or
> argued to the state supreme court or obvious in the
> record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a

federal court cannot grant habeas relief unless the state court's adjudication of

the claim was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United

States," or "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1),

(2). A state court's factual findings are "presumed to be correct" unless rebutted

"by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for
> evaluating state court rulings" and "demands that
> state-court decisions be given the benefit of the doubt."
> Renico v. Lett, 559 U.S. 766, 773 (2010) (internal
> quotation marks omitted). "A state court's
> determination that a claim lacks merit precludes
> federal habeas relief so long as fairminded jurists could

disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate

4

review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pope</u>

<u>v. Rich</u>, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that <u>Boerckel</u> applies to the

state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine

> of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[3] <u>supra</u>, at 747–748, 111 S. Ct. 2546; <u>Sykes</u>,[4] <u>supra</u>, at 84–85, 97 S. Ct. 2497.  A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>,

---

[3] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[4] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

> 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir.

---

[5] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward</u>, 592 F.3d at 1163. Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth

Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't

of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.    **Relevant Procedural History**

On April 22, 2013, a Second Amended Information charged Petitioner with racketeering (Count 1), conspiracy to commit racketeering (Count 2), burglary of a structure with damage in excess of $1,000.00 (Counts 3 and 5), and grand theft over $100,000.00 (Count 4), in connection with multiple burglaries of jewelry and pawn shops in the eastern United States. Resp. Ex. B at 14-41. After a four-day trial, the jury returned a verdict on June 6, 2013, finding Petitioner guilty as charged in Counts 1 through 4 and not guilty as to Count 5. Resp. Ex. G at 97-101; Resp. Ex. K at 191-92. The trial court ultimately sentenced Petitioner to a term of twenty-five years imprisonment on Count 1 to run concurrent with the sentences on Count 2 (twenty-five years), Count 3 (ten years), and Count 4 (five years). Resp. Ex. G at 108–15, Resp. Ex. L at 74-75; Resp. Ex. S at 3.

Petitioner, with help from appellate counsel, timely filed a direct appeal. Resp. Ex. G at 129. The First District Court of Appeal per curiam affirmed Petitioner's judgment and sentences without a written opinion on March 19, 2015, and issued the mandate on April 30, 2015. Resp. Ex. P.

On March 9, 2017, Petitioner, with help from postconviction counsel, filed a motion for postconviction relief under Florida Rule of Criminal Procedure

3.850. Resp. Ex. T at 11-53. After receiving the state's response and Petitioner's reply, the trial court summarily denied the Rule 3.850 motion on June 11, 2020. Id. at 366-89. Petitioner, with help from counsel, appealed the denial. Id. at 663-64. The First DCA per curiam affirmed the trial court's order without a written opinion on July 6, 2021, denied Petitioner's motion for rehearing and issuance of a written opinion on September 1, 2021, and issued the mandate on September 22, 2021. Resp. Ex. X; Resp. Ex. Y.

## IV.    The Petition

### A. Ground One

Petitioner argues that his trial attorneys[6] were ineffective for failing to object to the prosecutor and the state witness's comments about the phone number in state's exhibit 1: (1) belonging to Petitioner, (2) showing proof of Petitioner's participation in conversations, and (3) showing proof of Petitioner's physical presence. Doc. 1 at 10-19.

Petitioner raised this claim as ground one in his Rule 3.850 motion. Resp. Ex. T at 27-32. The trial court summarily denied the claim as follows:

> Defendant alleges his trial counsel was ineffective for failing to object to the prosecutor's and a state witness'[s] references to certain telephone records (State's Exhibit 1 at trial) as being those of the Defendant. The witness at issue was FDLE Special Agent Supervisor Andrew Shedlock, who testified

---

[6] At the trial, Petitioner was represented by Vanessa Newtson, Esq., and Mark Rosenblum, Esq.

about how he became involved in an investigation of jewelry store and pawn shop burglaries in the eastern United States. (Ex. "D" at 211-12.) He explained the distinctive way the crimes were committed, and recounted the sharing of information between various investigating agencies. (Id. at 212-16.) The *modus operandi* ("M.O.") of the crimes was distinctive enough, according to this witness, to allow investigators to identify burglaries of interest to them. Agent Shedlock testified:

> Due to . . . the rather specialized nature of these burglaries, these were not your garden-variety burglaries, and because the M.O. of the -- when you put together the entire system for lack of a better word, the entry through the roof, the disabling of the security systems in the video, the manner in which the safe was cut into and the lack of weapons being taken[,] it actually – easy may be too strong of a word, but it became quite doable to filter out burglaries that were of interest to our investigation from those that were not.

(Id. at 257-58.)

He testified that the Greensboro, North Carolina police department recovered a cell phone that had been left at the Diamond Gallery, the scene of a burglary in Greensboro, and that a set of phones was identified from the recovery of that phone in Greensboro. (Ex. "D" at 220.) He explained the different types of phone records that he received, and how he began to investigate subscriber information and usage records of

phones, as well as usage records of cell towers. (Id. at 222-25.) He stated that by examining patterns of phone usage, he determined that, when the users of the phones traveled away from south Florida, their travel normally corresponded with a burglary. (Id. at 239.)

After linking phones to known burglaries, the witness was able to discern usage patterns which, upon checking with local agencies to see whether they were investigating a burglary, tied those new burglaries, (committed in the distinctive way, as shown by police reports and crime scene photos) to the same group of phone users. (Ex. "D" at 240, 243-45.) He then explained how he developed a list of suspects, including Defendant, who was developed through investigative work related to records of hotel stays. (Id. at 245-46.) Agent Shedlock and other investigators would canvass hotels around the locations and dates of burglaries. (Id. at 214, 246.) In at least two instances, Defendant was identified as having checked into a hotel in the area of the Greensboro burglary: once at the Battleground Inn, and once at the Red Roof Inn. (Id. at 246, 435-36, 440.)

Agent Shedlock explained how he came to associate the phone from State's Exhibit 1 with Defendant. Defendant was arrested in December 2009 in Knoxville, Tennessee in possession of the phone whose records were State's Exhibit 6 at trial. (Ex. "D" at 249.) The Exhibit 1 phone was last used at 7:00 p.m. on November 10, 2009; the Exhibit 6 phone was first used at 1:05 p.m. the next day; there were 29 frequent callers on the Exhibit 1 phone, of which 18 were also on the Exhibit 6 phone. (Id. at 249-50.) That was the factual basis for Agent Shedlock's associating the phone from State's Exhibit 1 with Defendant. After Agent Shedlock testified to his involvement in the investigation of specific burglaries, and how he associated certain other phone records with specific individuals, the prosecutor in a question referred to "exhibit number 1, [as] Yenier Cardentey's phone records." (Id. at 265.) Defense counsel objected "to the line of questioning due to the

13

relevance regarding the specific number" and her objection was overruled. (Id. at 265.) A few minutes later, defense counsel successfully objected at sidebar to a lack of foundation for referring to State's Exhibit 1 as Defendant's phone records, and tied the objection to her previous objection to relevance (the one at page 265). (Id. at 282-87.)

In his Motion, Defendant acknowledges counsel's objection at page 282; his claim is that she should have posed the objection earlier. In fact, though, counsel identified the objection as the same as her previous objection. (Ex. "D" at 282.) Between the two objections, much of the testimony was about locations of cell towers relative to jewelry stores, the times of day when calls were made to or from various phones, and the numbers of calls and direct contacts between phones and which towers they pinged from. (Id. at 265-81.) During that time, out of 55 questions and 54 responses, State's Exhibit 1 was referred to as Defendant's phone records, sometimes indirectly, only 12 times (10 times by the prosecutor and twice by the witness). (Id. at 265-81.) The shorthand references to Exhibit 1 as Defendant's phone records during Agent Shedlock's testimony were based on his testimony of how he came to associate the phone with Defendant. (Id. at 318.) The Court might have sustained Defendant's objection earlier, if it had been renewed during the period of trial reported between pages 265 and 282, but even if those shorthand references had been totally eliminated, the absence of those references does not undermine confidence in the outcome of the trial. The basis of the references during Agent Shedlock's testimony was not lost on the jury; defense counsel reminded the jury of it, and attacked Agent Shedlock's conclusion, in closing argument. (Id. at 745-46, 748, 755-57.) Admissibility of the phone records themselves was challenged on appeal. (Ex. "E.") Counsel's objections appear to have been sufficient to preserve the issue for appeal, and the appellate court affirmed. (Ex. "B.") Therefore, this Court finds counsel's performance was not deficient.

In addition, there was evidence, other than law enforcement officers' testimony, associating Defendant with the phone from State's Exhibit 1. That phone number was listed as a contact, identified as "Pretty," in a phone in the possession of José Betancourt when he was interviewed after his arrest in Knoxville. (Ex. "D" at 648, 650-54.) Co-defendant Tony Sanchez testified that he knew Defendant by the nickname "Pretty Boy." (Id. at 496-97.) Sanchez testified that Defendant provided the Nextel phone Sanchez used during burglaries, and that Sanchez received it with co-conspirators' numbers already programmed into it, including Defendant's, all identified by nicknames. (Id. at 505-[]06.) Sanchez identified "Pretty Boy" as Defendant in the courtroom. (Id. at 509.) Defendant's protestations that the subscriber information in Exhibit 1 identified Alberto Peres are unpersuasive in light of the fact that the Exhibit 6 phone, which was in Defendant's possession when he was arrested in Knoxville, also had subscriber information identifying someone other than Defendant: Alberto Garcia. (Id. at 317-18.)

Therefore, this Court finds that Defendant has failed to establish that he was prejudiced by counsel's failure to object to references to State's Exhibit 1 as Defendant's phone records during the time reported between pages 265 and 282 of the trial transcript.

Resp. Ex. T at 368-71 (emphasis in original). The First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable

application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground One is denied.

### B. Ground Two

Petitioner asserts that his trial counsel were ineffective for failing to object to improper identification testimony. Doc. 1 at 20-23. Petitioner raised this claim as ground two in his Rule 3.850 motion. Resp. Ex. T at 32-34. The trial court summarily denied the claim as follows:

> As his second ground, Defendant alleges counsel rendered ineffective assistance by failing to object to Detective Mitchell's identification of Defendant in surveillance videos from the Diamond Gallery and Red Roof Inn in Greensboro, North Carolina. He alleges it invades the province of the jury for a law enforcement officer to offer an opinion of identity of a person in a recording without the predicate of expertise in making identifications from a recording, or of prior familiarity with the person in the recording.

> Before Detective Mitchell testified, the jury heard from the manager of the Red Roof Inn in Greensboro. (Ex. "D" at 370-80.) The State moved its trial exhibits 14 (hotel receipt/check-in record) and 15 (hotel surveillance video) into evidence through that witness. (<u>Id.</u>) The jury viewed the video, and the witness testified that only the person paying for the room was required to show identification, and that the person named on the State's trial exhibit 14 showed identification. (<u>Id.</u> at 374, 379.) The State's next witness at trial was Keon Edge, the employee of the Red Roof Inn who checked in the guests shown in the State's trial exhibit 15 and issued the State's trial exhibit 14. (<u>Id.</u> at 378, 381-85.) The witness described

the two men who checked into the room as: a dark-skinned Hispanic male who spoke English and had a scar from his ear to near his mouth; and a lighter-skinned Hispanic male who only spoke Spanish. (Id. at 386-87.) He testified that the man who only spoke Spanish was the one who paid for the room and showed a driver's license. He identified the two males as those shown on the State's trial exhibit 15, the hotel surveillance video. (Id. at 388.) The State's trial exhibit 14 names Yenier Cardentey as the person who registered for the room. (Ex "F.")

While testifying about still photos he took from surveillance video captured at the Diamond Gallery a few days before the burglary, Detective Mitchell pointed out a distinctive t-shirt worn by one of two people who the owner of the Diamond Gallery had considered suspicious visitors to his store. (Ex. "D" at 421, 424, 428.) Detective Mitchell testified that he traveled to Knoxville, Tennessee to view evidence taken from a burglary there, and took a shirt back to Greensboro with him. (Id. at 446-47.) The State showed the witness a box sealed with a Greensboro Police Department evidence sticker. (Id. at 447.) Defense counsel conducted voir dire on the subject of the witness'[s] personal knowledge of any connection between the car from which the shirt was seized in Knoxville and the people arrested in Knoxville. (Id. at 448-49.) At the conclusion of the voir dire, defense counsel objected to admission of the shirt on grounds of relevance and lack of foundation. (Id. at 449-52.) The Court sustained the objection. (Id. at 452.) Detective Mitchell then testified that he seized the shirt from Knoxville because he recognized it from both the Diamond Gallery and Red Roof Inn surveillance videos. (Id. at 453-54.) He recognized the shirt by the pattern printed on it. (Id. at 454.) He identified Defendant as the one wearing the shirt in the Diamond Gallery and at the Red Roof Inn upon check-in. (Id.) When the State attempted to move the shirt into evidence, defense counsel raised the "[s]ame objection . . . ." (Id.) The

17

Court overruled the objection. (Id.)

Defendant relies, among other authorities, on <u>Charles v. State</u>, 79 So. 3d 233 (Fla. 4th DCA 2012), but that case is distinguishable. In <u>Charles</u>, the jury viewed surveillance video from a gas station showing someone using a stolen credit card. <u>Charles</u>, 79 So. 3d at 235. A detective testified for the State, over objection, "that, while he was unable to identify the person in the video when he originally saw it, he was later able to piece things together and identify the person in the video as appellant." <u>Id.</u> The <u>Charles</u> court noted, "There is a danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial." <u>Id.</u>

There is no such danger in this case. Before Detective Mitchell testified, the jury had already viewed [the] surveillance video from the Red Roof Inn and, after hearing testimony from the manager and from the employee who performed the check-in captured on the video, and having seen the check-in paperwork (Ex. "F"), the jury already knew that the person wearing the distinctive t-shirt in the Red Roof Inn video identified himself as Yenier Cardentey when he checked in. That information was conveyed to the jury without Detective Mitchell's involvement. Detective Mitchell also made it clear that it was his recognition of the t-shirt in the videos that made him seize the shirt taken in Knoxville. The information Detective Mitchell relied on was also possessed by the jury; his thought process in reaching his opinion was out in the open: he recognized the shirt, and the man wearing the shirt had already identified himself once as the Defendant. The jurors had no reason to believe Detective Mitchell's specialized training, or his access to information the jurors themselves did not have, underlay his identification of Defendant in the videos. The jury also knew that, on the date the Diamond Gallery surveillance video was recorded, September 17, Defendant was a registered guest at the Battleground Inn in Greensboro. (Ex. "D"

at 421, 440.)

In <u>Alvarez v. State</u>, 147 So. 3d 537 (Fla. 4th DCA 2014), also relied upon by Defendant, a detective, after watching surveillance video of a convenience store robbery "fifty to seventy five" times, offered his opinion that the suspects were a dark-skinned male and a light-skinned Hispanic or white male. <u>Alvarez</u>, 147 So. 3d at 540-41. The detective's testimony was the only evidence of the skin color of the perpetrators. <u>Id.</u> at 544. A witness who had known the defendant for years watched the video and could not identify the perpetrators. <u>Id.</u> The court held it was error to admit the detective's identification testimony and remanded for a new trial. <u>Id.</u> In doing so, the court relied on <u>Charles</u>: "This court has observed that when a police officer gives impermissible identification testimony, '[t]here is the danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial.'" <u>Id.</u> (citation omitted). As it is [sic] from <u>Charles</u>, the instant case is distinguishable from <u>Alvarez</u>. The <u>Alvarez</u> court noted, "no record evidence exists which indicates that the detective was in a better position than the jurors to view the highly inconclusive and indiscernible surveillance video and enlarged stills and thereby determine the skin color and races of the perpetrators." <u>Id.</u> at 543. The point, however, was that the jurors in <u>Alvarez</u> might have *believed* the detective was in a better position than they. Here, Detective Mitchell did not tell the jury he had viewed the surveillance videos more times than the jury had, and did not claim special ability to discern facts from an indistinct image. There was no danger that the jury would defer to Detective Mitchell's opinion, because it was apparent that his opinion was based on recognition of the t-shirt. Also significant is that, in the instant case, the jury watched a person on video create a paper record, and saw the paper record where that person had identified himself as Yenier Cardentey. Those facts distinguish this case from all the cases relied upon by

Defendant.

Among Defendant's authorities, the one most closely resembling the instant case is <u>Proctor v. State</u>, 97 So. 3d 313 (Fla. 5th DCA 2012)[.] There, a detective viewed bank surveillance video of a man cashing stolen checks. <u>Proctor</u>, 97 So. 3d at 313. The driver's license number on the check endorsements was not in the Florida Driver and Vehicle Information Database ("DAVID"), but the detective found a similar driver's license number in DAVID by searching the name of the endorser. <u>Id.</u> at 314. The witness opined that the man in the bank video matched the photograph and description from the named person's record in DAVID (race, height, mustache color), and also opined that the signature on the DAVID record matched the check endorsements. <u>Id.</u> Part of the reason the testimony was held inadmissible was the witness'[s] lack of training in handwriting analysis—a fact not at issue in the instant case—and part was the fact the witness had neither prior familiarity with the defendant nor qualification as an expert in video identification. <u>Id.</u> at 315. The <u>Proctor</u> court also, like the other cases, noted the danger that jurors would defer to an officer's perceived special training and access to extra-record information. <u>Id.</u>

In contrast, Detective Mitchell did not consult any databases or other sources the jury had not seen and could not access. He did not base his opinion on comparison of Defendant's physical features with a known photograph or written description of Defendant (not accessible to the jury), but on the distinctive t-shirt. Defendant does not argue the shirt is not distinctive; in fact, he admits that "[a] video of the Red Roof Inn on the morning of September 21, 2009 showed a man wearing the same shirt in the surveillance video for September 17, 2009 at Diamond Gallery." (Mot. at 10.)

Unlike the cases cited by Defendant, there was no

danger in this case that the jurors would give undue credence to Detective Mitchell's identification testimony. The jurors could determine for themselves if they believed the man in the t-shirt was the same in both videos, and as part of their deliberations would have weighed Detective Mitchell's testimony. The witness did not preclude that weighing. In closing argument, Defendant attacked both the uniqueness of the t-shirt ("That shirt can be sold in K-Mart") and the State's inference that, because the t-shirt was found in Defendant's duffel bag in Knoxville, Defendant must have been the one wearing it in Greensboro. (Ex. "D" at 743.) The general tenor of defense's closing was that the State's case was built on inferences not supported by the evidence and common sense. (Id. at 738-39.) In its rebuttal closing, the State emphasized that the shirt was the reason "we know this is – this is Yenier Cardentey." (Id. at 779-80.) On the facts of the instant case, this Court finds defense counsel's performance was not deficient, and Ground Two is therefore without merit.

Resp. Ex. T at 371-76 (emphasis in original). The First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Two is denied.

21

## C. Ground Three

Petitioner argues his trial counsel were ineffective for failing to object to and exclude improper and prejudicial hearsay and improper opinion testimony as to Petitioner's employment and place of residence. Doc. 1 at 23-26. Petitioner raised this claim as ground three in his Rule 3.850 motion. Resp. Ex. T at 34-36. The trial court summarily denied the claim as follows:

> For his third ground, Defendant alleges ineffective assistance of counsel for failure to object to Agent Shedlock's hearsay and opinion testimony that Defendant did not reside at the address listed on his driver's license, and that Defendant had no discernible pattern of movement associated with regular employment. Defendant focuses on the witness'[s] testimony that he conducted "minimal" surveillance of Defendant to reach those two conclusions. Defendant also notes Agent Shedlock's testimony that Defendant was initially developed as a suspect "through intelligence sharing related to investigative work done by other agencies involved in this case related to particularly hotel room check-ins." (Ex. "D" at 245-46.) As to that evidence, there was no prejudice because direct evidence of hotel room check-ins by Defendant was introduced through other witnesses. (Id. at 386-88, 440; Exs. "F," "G.") As to the first two issues, Defendant's claims of prejudice are that: living at an address other than that shown on the driver's license implies deception and a guilty conscience; and lack of regular employment implies that Defendant was living off ill-gotten gains.
>
> Defendant characterizes the witness'[s] testimony as opinion based on speculation, but his quarrel is truly with the witness'[s] competence to testify as an eyewitness based on "minimal" surveillance. Whatever quantum of eyewitness observation is connoted by the

word "minimal," it is without dispute that Agent Shedlock's testimony regarding Defendant's residence and apparent employment, or lack thereof, was based on the witness'[s] own observations. The jury was free to assign little weight to that testimony because it was based on "minimal" observation, but the witness'[s] description of his surveillance as "minimal" does not make his testimony inadmissible. Cf. Edwards v. State, 538 So. 2d 440 (Fla. l989) (holding [a] courtroom identification [was] improperly admitted, describing [a] witness'[s] opportunity to observe [the] subject as "minimal," where [the] witness barely glanced at [the] subject in [the] car, and was only able to see [the] outline of [the] subject's face). Therefore, counsel's performance was not deficient.

Even if the testimony were inadmissible, this Court finds no prejudice. In closing argument, the State did not refer to either fact, much less urge the inferences Defendant posits as prejudicial. (Ex. "D" at 703-38, 764-84.) Absence of the testimony itself from the record does not undermine confidence in [the] outcome, in light of the surveillance videos, hotel records, phone records (including a saved phone number identified as "Pretty," combined with witness Tony Sanchez's testimony that Defendant's nickname was "Pretty Boy"), and the duffel bag recovered from the Knoxville burglary attempt containing Defendant's identification and credit cards as well as the distinctive t-shirt. (Id. at 496-97, 505-[]06, 509, 668-69.) In light of all that evidence, this Court finds that the admission of Agent Shedlock's testimony about Defendant's residence and employment caused no prejudice.

Resp. Ex. T at 376-78. The First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough

review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Three is denied.

### D. Ground Four

Petitioner contends his trial counsel were ineffective for failing to object to improper hearsay testimony about Petitioner and his co-defendants' prior planning and criminal acts. Doc. 1 at 26-30. Petitioner raised this claim as ground four in his Rule 3.850 motion. Resp. Ex. T at 36-39. The trial court summarily denied the claim as follows:

> As his fourth ground, Defendant alleges ineffective assistance of counsel for failure to object to hearsay establishing prior planning and criminal acts by Defendant and co-defendants. The first testimony at issue was by Agent Shedlock: "I received information that there may be a burglary that was going to occur to a business in Knoxville, Tennessee[,] and I relayed that information to the Knox County Sheriff's Office." (Ex. "D" at 312.) Defendant's complaint is that "it was never adduced how Agent Shedlock came by this information." (Mot. at 26.) Defendant then alleges that counsel should have objected to Detective Merritt's testimony that Agent Shedlock told Detective Merritt he had been looking into several burglaries in the southeast, and that Detective Merritt had received information that one of the groups they were watching was coming to Knoxville to commit a burglary. Defendant asserts that Detective Merritt's testimony that they were able to identify vehicles, tag numbers,

and some suspects, was objectionable. Finally, Detective Merritt's testimony as to M.O., a "well established sequence of events[,]" is alleged to have been objectionable as having been gleaned from other departments' surveillance and making reference to uncharged offenses. (Ex. "D" at 643.) Defendant alleges the testimony of advance knowledge by law enforcement, and the specificity, made the jury believe one burglar had informed on the others, or the police had tapped phones, depriving Defendant of his right to confront witnesses against him.

However, the jury heard evidence about the consistency of the group's M.O., and how law enforcement officers learned of it. (Ex. "D" at 212-[]16.) Regarding the similarities among the different burglaries, Agent Shedlock testified:

> Q    Were you -- were there any similarities between the burglary to Knox Jewelry and Loan where Mr. Cardentey and other individuals were arrested in progress and any of the burglaries that we've discussed here today being Kingsley Jewelers, Alachua Pawn, the Diamond Gallery[,] and Blanding South?

> A    Yes, there w[ere].

> Q    Can you please describe to the jury what these similarities [were] between the Knox -- Knox Jewelry and Loan and the other burglaries we've been discussing?

> A    Entry was made into the business through a hole cut in

the roof. The alarm system was disabled. There was an attempt to cut into the safe with a plasma cutter that was unsuccessful due to the burglary being interrupted in progress and the defendants were checked into a hotel close to the burglary during the time of the burglary.

(Id. at 313-14.) Noteworthy is the fact that none of the testimony complained of was offered to prove the truth of the matters asserted, i.e., that there would be a burglary in Knoxville, or that the burglars would enter through the roof, or that any of the other similarities in M.O. would occur. Those facts explained law enforcement's presence at the scene and the chronology of the investigation. Neither witness testified that they had reason to expect to find Defendant in Knoxville, that they had been tipped off that Defendant would be there, that he was part of the group they believed might be coming, or that they were looking for him specifically, but only a possible burglary by a group whose M.O. had been established through cooperative investigation. Counsel was not deficient for failing to object to admissible testimony.

The fact that Defendant's identity was not included in the information shared among investigative agencies distinguishes this case from Chambers v. State, 742 So. 2d 839 (Fla. 3d DCA 1999), on which Defendant relies. Also noteworthy is the fact that the jury acquitted Defendant of two of the five predicate crimes charged under the RICO count, despite the similar M.O. evidence. The acquittals, especially, demonstrate that Defendant was not prejudiced by the admission of evidence he complains of in this ground. Ground Four is without merit.

Resp. Ex. T at 378-80. The First DCA per curiam affirmed the denial without a

written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. See 28 U.S.C. § 2254(d). As the trial court found, Petitioner's caselaw is distinguishable. Another case, not specifically mentioned by the trial court, seems more closely on point. See Boykin v. State, 601 So. 2d 1312 (Fla. 4th DCA 1992). In Boykin, the court concluded that testimony from an officer, who was called to testify as to collateral crimes, was not inadmissible hearsay, where the officer "had investigated a later robbery/aggravated assault that was nearly identical in its key facts to the one [Boykin] was charged with"; "[o]ther officers had given him certain information[,] which he 'ran through a computer,'" and "yielded a name"; and then he "prepared an array of six photographs of different people, which he showed to two eyewitnesses of the later robbery." Id. at 1313-14. The court explained the "information" the officer received "was not offered to show that [Boykin] had committed the robbery, but instead to show why the witness prepared an array of photographs that included [Boykin's]." Id. at 1314. "Even if it had been error," the court found "it

27

was harmless," noting, in part, that "[t]he pattern of events in the collateral

crime was both identical to this one and just as idiosyncratic." Id.

Ground Four is denied.

**E. Ground Five**

Petitioner argues that his trial counsel were ineffective for failing to

impeach the state witness and cooperating co-defendant, Tony Sanchez. Doc. 1

at 30-33. Petitioner raised this claim as ground five in his Rule 3.850 motion.

Resp. Ex. T at 39-42. The trial court summarily denied the claim as follows:

> Defendant's fifth ground alleges ineffective assistance
> of counsel for failure to impeach cooperating co-
> defendant Tony Sanchez. Defendant attaches portions
> of Sanchez's deposition, in which he testified that he
> participated in the Kingsley Jewelers burglary with
> Defendant, providing details of his and Defendant's
> involvement. At trial, the witness testified that he
> burglarized jewelry stores with Defendant and others,
> but did not testify to which stores. The witness testified
> on cross-examination:
>
>> Q    Mr. Sanchez, are you
>> listed as a co-defendant to Mr.
>> Cardentey in predicate 13 of
>> burglary of a store called
>> Diamond Gallery?
>>
>> A    (Through    interpreter.)
>> Can you repeat the question?
>>
>> Q    Are you charged in this
>> case that you entered your plea
>> agreement to alongside with
>> Mr. Cardentey in predicate
>> number 13, the store called a

Diamond Gallery?

A      (Through      interpreter.)
Yes.

Q      And this is the Diamond
Gallery in Greensboro, North
Carolina. Do you know if you're
charged as a co-defendant in
this predicate along with Mr.
Cardentey?

A      (Through      interpreter.)
No.

Q      Okay.      How      about
predicate seven, a store called
Kingsley Jewelers in Orange
Park, Florida, have you been
charged as a co-defendant
alongside of Mr. Cardentey in
that charge?

A      (Through interpreter.) I
don't know.

Q      Okay. Do you know what
predicates you yourself are
actually charged in regarding
any of the predicates in this
case?

A      (Through      interpreter.)
Yes. You mean here? The other
ones I don't remember.

* * *

Q      Mr.   Sanchez,   I   am
putting in front of you the
information which has the

charges and predicates of this case. I'm showing you predicate 13. Says predicate incident 13, the Diamond Gallery in Greensboro, North Carolina, and within that it has a list of the people that have been charged with that predicate. Can you look at it?

A     (Through interpreter.) Yes.

Q     Is your name listed as a person that was charged with that predicate?

A     (Through interpreter.) Yes.

Q     Is your name there?

A     (Through interpreter.) No.

Q     Okay. So you weren't charged with this predicate?

A     (Through interpreter.) No, because I wasn't there.

Q     Okay. I'm going to show you some other predicates.

A     (Through interpreter.) Show me where I was.

Q     I'm going to ask you the questions. I'm showing you what's listed as predicate incident number seven. It's

page six of the information. This is for a store called Kingsley Jewelers, Orange Park, Florida, and it's for a burglary to a structure. Within it are the listed names of the people that have been charged with this specific incident. Is your name there?

A    (Through interpreter.) No.

(Ex. "D" at 523-25.) The above testimony was elicited after establishing that the witness had been facing a maximum sentence of 90 years in this case, but that he and the State had negotiated a sentence of 7 years in prison followed by 20 years[] probation, in exchange for his cooperation. (Id. at 520-22.) [Co-]Defendant's testimony on cross-examination continued:

Q    It doesn't appear that you're very clear on dates and places. Why is that?

A    (Through interpreter.) Because I don't know. I came to this country and I didn't know, you know, what the date or the location where I was. I don't speak English. I don't know.

Q    But you are an adult and if you're going somewhere[,] wouldn't you know where you were going?

A    (Through interpreter.) I do[,] but I don't -- I can't give you the exact date and time because I don't remember.

31

> Q    But what you do know is
> that because in a previous case
> you testified and cooperated
> with the state, you know that
> in this case since you're
> cooperating and testifying for
> the state[,] you're going to get
> a benefit from that.
>
> A    (Through interpreter.)
> Yes.

(Id. at 528.)

Defendant asserts that counsel should have asked Sanchez about the deposition testimony and argued the witness'[s] lack of credibility, because the witness was willing to lie at deposition to get the sentence-reduction benefit of cooperation with the State. However, impeaching the witness by pointing out inconsistency between trial testimony (which did not place the witness and the Defendant together at any of Defendant's charged predicate offenses) and deposition testimony, where the witness testified at length and in detail about his involvement with Defendant in one of the predicates, would have offered little value as an attack on the witness'[s] credibility. Cooperation by giving deposition testimony implicating a defendant would not assist the State in securing a conviction if the jury never heard of the deposition testimony. By impeaching the witness at trial with his deposition testimony, defense counsel would have been furthering the witness'[s] interest (the basis for the witness'[s] arguable bias), at the expense of introducing *inculpatory* evidence. Moreover, as the State aptly points out in its response, the witness'[s] trial testimony—that he was not *charged* in the Kingsley Jewelers burglary—is not inconsistent with his deposition testimony that he participated in it. "To be inconsistent, a prior statement must either directly

contradict or materially differ from the expected testimony at trial." State v. Hoggins, 718 So .2d 761, 771 (Fla. 1998) (citation omitted).

As seen in the testimony above, the witness did not testify consistently or reliably about whether he was charged in the Diamond Gallery burglary, even with the information in front of him for reference. Defense counsel made a reasonable, tactical decision to highlight those shortcomings in the witness'[s] testimony, and to emphasize the much-reduced negotiated sentence the witness faced in exchange for his cooperation with the State. In closing argument, defense counsel urged the jury to disregard Sanchez's testimony, citing the lack of cell phone evidence connecting the witness to the racketeering enterprise or conspiracy, the witness'[s] bias inherent in his cooperation agreement with the State, his general demeanor and lack of knowledge, and the fact that there was no evidence the witness played any part in the predicate offenses Defendant was charged with. (Ex. "D" at 751-55.) That trial strategy makes much more sense, with much less risk to Defendant, than what Defendant asserts, in hindsight, his counsel should have done: impeach the witness with his deposition testimony that he participated with Defendant in the Kingsley Jewelers burglary, allowing the witness to surprise counsel. The witness may have reaffirmed his deposition testimony, claiming his trial testimony was based on imperfect recollection and misunderstanding, and gone on to provide rich details of his and Defendant's involvement in the Kingsley Jewelers burglary. The risk of such inculpatory testimony outweighs the persuasive value of the argument defense counsel did make at trial—that the witness had no evidence of being involved in Defendant's predicate offenses. Had the witness admitted at trial that his deposition testimony was false, the jury would still have heard the deposition testimony, which was inculpatory evidence [that] they otherwise would not have known of. An evidentiary

> hearing is not necessary to see that these were probable outcomes had defense counsel attempted to impeach the witness with his deposition testimony.
>
> Defense counsel's performance was not deficient, because the witness'[s] statements were not inconsistent. Even if the witness could have been impeached by his prior statements, an attempt to do so would more likely have prejudiced Defendant than aided him. Ground Five is without merit.

Resp. Ex. T at 380-83 (emphasis in original). The First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. See 28 U.S.C. § 2254(d).

As the trial court found, defense counsel made a strategic decision to highlight the shortcomings in the witness's testimony and emphasize his significantly reduced negotiated sentence rather than impeach him with his deposition testimony, which made much more sense, with much less risk to

Petitioner.[7] The Eleventh Circuit has instructed that:

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct. By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law[,] not one of fact, so we decide it de novo.

Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998). Petitioner has not provided clear and convincing evidence to overcome the trial court's factual determination that counsel made a tactical decision, and the Court presumes the determination to be correct. See 28 U.S.C. § 2254(e)(1) (stating that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence").

Further, Petitioner has failed to demonstrate that no reasonable attorney would have adopted the same strategy as his trial counsel. See Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983) (stating that strategic

---

[7] Contrary to Petitioner's assertion, an evidentiary hearing was not required. See Jackson v. State, 975 So. 2d 485, 486 (Fla. 2d DCA 2007) (stating that "an evidentiary hearing is not required when it is obvious from the record that counsel's decision was strategic") (citing State v. Williams, 797 So. 2d 1235, 1239 (Fla. 2001) (per curiam), and McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir. 1984) (per curiam)).

decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it"); see also White, 972 F.2d at 1220 ("The [Strickland] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."). As counsel's tactical decision was reasonable enough to fall within the wide range of professional competence, Petitioner has failed to demonstrate deficient performance. See Provenzano, 148 F.3d at 1330; see also Knight v. Fla. Dep't of Corr., 936 F.3d 1322, 1340 (11th Cir. 2019) ("In assessing an attorney's performance under Strickland, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'") (quoting Strickland, 466 U.S. at 690); Schoenwetter v. State, 46 So. 3d 535, 555 (Fla. 2010) (per curiam) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.") (citing Wiggins, 539 U.S. at 521). If anything, impeachment of the witness through his deposition testimony might have been more detrimental to Petitioner's case given the inculpatory evidence that it could

have introduced into the trial. Therefore, Ground Five is denied.

### F. Ground Six

Petitioner argues that the state committed a <u>Brady</u>[8] violation by not informing the defense prior to trial that Tony Sanchez had claimed to have been involved in a burglary of Kingsley Jewelers with Petitioner, when, in fact, he had not been. Doc. 1 at 33-35. Petitioner raised this claim as ground six in his Rule 3.850 motion. Resp. Ex. T at 42-43. The trial court summarily denied the claim as follows:

> Defendant asserts in Ground Six that the State violated [<u>Brady</u>], by failing to inform Defendant prior to trial that Sanchez claimed to [have] be[en] involved in the Kingsley Jewelers burglary with Defendant, when Sanchez had not actually been. To establish a <u>Brady</u> claim, Defendant must show: (1) the evidence was favorable to him for exculpatory or impeachment purposes; (2) the State willfully or inadvertently suppressed the evidence; and (3) Defendant was prejudiced by the suppression. <u>Taylor v. State</u>, 848 So. 2d 410, 412 (Fla. 1st DCA 2003). "There is no <u>Brady</u> violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence." <u>Freeman v. State</u>, 761 So. 2d 1055, 1062 (Fla. 2000) (quoting <u>Provenzano v. State</u>, 616 So. 2d 428, 430 (Fla. 1993)). The materiality of the suppressed evidence must not be speculative.

> In order to be entitled to relief on a <u>Brady</u> claim, the defendant must also show that

---

[8] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

> the evidence "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Gorham v. State</u>, 521 So. 2d 1067, 1069 (Fla. 1988) . . . . The mere possibility that undisclosed items of information may have been helpful to the defense in its own investigation does not establish constitutional materiality.

<u>Wright v. State</u>, 857 So. 2d 861, 870 (Fla. 2003).

The burglary and grand theft of Kingsley Jewelers were charged in Counts 3 and 4 of the Second Amended Information. (Ex. "H" at 27.) The two defendants charged were Yenier Cardentey and José Betancourt; Tony Sanchez was not charged in those Counts. (<u>Id.</u>) Sanchez was charged with committing other offenses. (<u>Id.</u>) Therefore, defense counsel knew that Sanchez was not charged in the Kingsley Jewelers burglary. By the charging document, the State informed Defendant which offenses it believed he, and the various co-defendants, participated in. The only indication that Sanchez *did* participate in the burglary of Kingsley Jewelers was his deposition testimony to that effect. Defense counsel was present at the deposition and examined the witness. (Ex. "I.") Therefore, Defendant was aware of Sanchez's claim to have participated with Defendant in the burglary of Kingsley Jewelers.

Defendant alleges that the State knew Sanchez lied at this deposition when he testified [that] he and Defendant burglarized Kingsley Jewelers, and that the State had an obligation to inform Defendant that Sanchez lied. At trial, the prosecutor stated: "[A] witness that is a part of the enterprise would not necessarily be also a part of the specific defendant's

pattern of racketeering. In this particular case[,] I don't believe there are any – any predicates that both of them were in on." (Ex. "D" at 513.) The prosecutor's statement of belief is consistent with the charging document, and, even attributed to the State, the belief does not constitute or indicate personal knowledge of Sanchez's involvement at Kingsley Jewelers. There is no indication that the prosecution knew more than Defendant about Sanchez's involvement in the enterprise, or specific predicates. Without any such knowledge by the State, there was no suppression of evidence. And, as pointed out under Ground Five, impeachment of Sanchez at trial with his deposition testimony would more likely have been unfavorable to Defendant. Ground Six is without merit.

Resp. Ex. T at 383-85 (emphasis in original). The First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. See 28 U.S.C. § 2254(d); Resp. Ex. J at 72-74; Resp. Ex. T at 221-22, 249-51, 262. Ground Six is denied.

### G.    Ground Seven

Petitioner argues his trial counsel were ineffective for failing to object to

improper prosecutorial argument. Doc. 1 at 35-41. Petitioner raised this claim as ground seven in his Rule 3.850 motion. Resp. Ex. T at 43-49. The trial court summarily denied the claim as follows:

> Defendant's seventh ground alleges ineffective assistance of counsel for failure to object to improper argument by the prosecutor, specifically the State's comment in closing argument: "I submit to you that the guy in the sunglasses is the defendant here, Yenier Cardentey. I don't think there's any question about it when you see the same thing going on in Greensboro, North Carolina." (Ex. "D" at 717.) None of the prohibited acts listed in the Motion—referring to extra-testimonial facts, urging unreasonable inferences, suggesting there is inculpatory evidence the jury did not hear—are implicated in the State's argument. Contrary to Defendant's assertion that no evidence linked him to the Kingsley Jewelers burglary, there was circumstantial evidence linking him to it, as there was circumstantial evidence of Defendant's guilt of other predicate offenses. (Id. at 261, 313-14, 329, 486-87, 680, 682-84.) The prosecutor was merely urging the jury to infer Defendant's identity from the similarity of the Kingsley Jewelers surveillance video to that from the Diamond Gallery. "It is not impermissible for the prosecutor to suggest during closing argument reasonable inferences that the jury may draw from the evidence." Calhoun v. State, 44 Fla. L. Weekly S252 (Fla. Nov. 21, 2019), reh'g denied, SC18-1174, 2020 WL 710270 (Fla. Feb. 12, 2020). Counsel's performance was not deficient, and Ground Seven is without merit.

Resp. Ex. T at 385-86. The First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough

40

review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. See 28 U.S.C. § 2254(d). As the trial court stated, the prosecutor merely suggested reasonable inferences to be drawn from the evidence, which were supported by circumstantial evidence in the record. See Resp. Ex. I at 18-21, 72-73, 88-89; Resp. Ex. J at 25-30, 45-46; Resp. Ex. K at 41-43, 75.

Ground Seven is denied.

### H.    Ground Eight

Petitioner argues his trial counsel were ineffective for failing to request an accomplice jury instruction. Doc. 1 at 41-44. Petitioner raised this claim as ground eight in his Rule 3.850 motion. Resp. Ex. T at 49-51. The trial court summarily denied the claim as follows:

> As his eighth ground, Defendant alleges ineffective assistance of counsel for failure to request an accomplice instruction. At the time of trial, the standard accomplice instruction was Florida Standard Criminal Jury Instruction 3.9(b). It read:
>
>> You should use great caution in relying on the testimony of a witness who claims to have helped the defendant commit a crime. This is particularly true when there is no other evidence tending to agree with

what the witness says about
the defendant.

However, if the testimony of
such a witness convinces you
beyond a reasonable doubt of
the defendant's guilt, or the
other evidence in the case does
so, then you should find the
defendant guilty.

In re Standard Jury Instructions in Criminal Cases-
Report 2012-07, 122 So. 3d 302, 309 (Fla. 2013).
Effective in September, 2013, subsections of standard
instruction 3.9, including the accomplice instruction,
were no longer identified as subsections, but appeared
within instruction 3.9 after a note reading, "Give as
applicable and if requested." Id. at 308. The amended
version reads:

*Accomplices and informants.*

You must consider the
testimony of some witnesses
with more caution than others.
For example, a witness who
[claims to have helped the
defendant commit a crime]
[has been promised immunity
from prosecution] [hopes to
gain more favorable treatment
in his or her, own case] may
have a reason to make a false
statement in order to strike a
good bargain with the State.
This is particularly true when
there is no other evidence
tending to agree with what the
witness says about the
defendant. So, while a witness
of that kind may be entirely

truthful when testifying, you should consider [his][her] testimony with more caution than the testimony of other witnesses. However, if the testimony of such a witness convinces you beyond a reasonable doubt of the defendant's guilt, or the other evidence in the case does so, then you should find the defendant guilty.

Id.

When analyzing whether it was fundamental error to fail to give an accomplice instruction, the Florida Supreme Court has opined:

The content of the charge was in fact clearly referred to and covered by counsel in their presentations to the jury; furthermore, the general charge, with regard to how a jury is to treat the testimony of witnesses and give it such weight as they see fit under all of the evidence, substantially covers the question raised here. We do not recommend that such a charge in these circumstances not be given; we simply say that it was not fundamental error which would justify reversing the jury's verdict. It is discretionary.

The third factor that sufficiently covered the

43

problem was the cross-examination of the accomplice which made it perfectly plain that he was a questionable and suspect witness. There can be little doubt that a jury of reasonable men and women clearly understands that the testimony of an accomplice is to be closely scrutinized and critically considered under these circumstances. There is nothing shown that would indicate to the contrary here[.]

Dennis v. State, 817 So. 2d 741, 751 (Fla. 2002) (quoting Boykin v. State, 257 So. 2d 251, 252 (Fla. 1971) (internal quotation marks omitted). Affirming denial of a motion for postconviction relief alleging ineffective assistance of counsel for failure to request an accomplice instruction, the Fifth District cited Dennis, holding that counsel's omission did not warrant relief "given the weight of all the evidence, counsel's presentation of the issue during trial and the other general instructions on witness credibility and weight of the evidence." Simpson v. State, 895 So. 2d 1210, 1213 (Fla. 5th DCA 2005).

Like the jury in Simpson, this jury was instructed on weighing the evidence, which applied to witness Tony Sanchez as well as other witnesses. (Ex. "D" at 804-806.) The Court instructed the jury to consider whether the witness had been offered or had received any benefit in order to get the witness to testify, and whether the witness had been convicted of a felony or misdemeanor involving dishonesty or false statement. (Id. at 805.) As noted above, defense counsel emphasized in cross-examination and argument the large reduction in sentence—from 90 to 7 years—witness Sanchez expected to receive in exchange for testifying. (Id. at 520-22, 753.) Defense counsel also

argued the lack of corroboration of the witness'[s] testimony, the witness'[s] lack of knowledge and the fact that Sanchez's testimony omitted key points. (<u>Id.</u> at 751-55.) As in <u>Dennis</u>, the content of the accomplice instruction was "clearly referred to and covered" in counsel's presentation to the jury. <u>Dennis</u>, 817 So. 2d at 751. The general instruction on weighing evidence also substantially covered the issue, and counsel's cross examination of Sanchez "made it perfectly plain that he was a questionable and suspect witness." <u>Id.</u> Defendant was not prejudiced by the omission of an accomplice instruction. Ground Eight is without merit.

Resp. Ex. T at 386-88 (emphasis in original). The First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. X.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d); Resp. Ex. J at 58, 79-87; Resp. Ex. K at 111-14, 118-19, 163-65. Ground Eight is denied.

### I.    Ground Nine

Petitioner argues the trial court erred in denying his request for a special verdict form as to Count 2, listing the predicate offenses for racketeering, which resulted in denial of his constitutional right to a unanimous verdict. Doc. 1 at

44-47. At the trial, the following exchange took place after the state rested:

> MS. NEWTSON: . . . On the information[,] the predicate incidents are listed under the conspiracy charge, count two, just like they are under count one[,] and we would ask that on the verdict form for count two[,] they would also be listed. They have not been listed at this point.

> THE COURT: All right. Any objection to that?

> MS. ECKLEY: Yes. Pursuant to U.S. v. Starrett, S-T-A-R-R-E-T-T, which is 55 Federal 3d 1525, an Eleventh Circuit case, if the government proves an agreement of or an overall objective[,] it's not necessary that the defendant agree to personally commit two predicate acts to establish a RICO conspiracy. We are not required to prove that he committed any of the predicate incident acts to prove our conspiracy to commit racketeering case, so we would object to them being listed on the verdict form.

> . . .

> THE COURT: . . . I have had a chance to review U.S. vs. Starrett and, of course, I've heard the arguments of the defense on this issue. Is there anything else you want to tell me, Mr. Rosenblum or Ms. Newtson, on this?

> MR. ROSENBLUM: Well, only that U.S. vs Starrett is an Eleventh Circuit case. I tried to shepardize it as we used to say, but there is 1,314 hits that you get and I quite frankly couldn't get far enough to see whether there were any Florida cases that cited it or adopted that same philosophy, but I do -- I read the case. I see what the Eleventh Circuit said. I just don't know under Florida law whether that would be the case or not.

> THE COURT: Understood, and having reviewed the case as well as the Court's understanding of the law in

> this area[,] the Court will deny . . . defendant's request
> . . . as to count [two]. . . . That's what I'm denying is the
> language that you're asking for on the verdict form for
> that count.

Resp. Ex. K at 50-51, 59-60.

Petitioner, with help from appellate counsel, presented this claim as issue

VI in his direct appeal initial brief, Resp. Ex. M at 47-52, where he argued in

relevant part:

> The verdict form in this case regarding the
> racketeering conspiracy leaves the court guessing
> whether Cardentey's right to a unanimous jury has
> been upheld. Particularly given the jury's rejection of
> the state's proof that he participated in some predicate
> incidents, and the weakness of the evidence regarding
> others, unanimity regarding the conspiracy count is
> highly questionable. To the extent federal caselaw
> suggests a different result, Cardentey maintains the
> Florida constitutional right to a unanimous verdict
> provides greater protection. Because the trial court's
> refusal to grant Cardentey's request for a special
> verdict on the conspiracy count delineating the
> predicate offenses (just like the substantive racketing
> charge), the trial court abused its discretion and this
> conviction must be vacated.

Id. at 51-52. In its answer brief, the state responded, in part, as follows:

> No legal basis was given for defense counsel's request
> for the special verdict form, and no subsequent
> objection was made when the trial court denied the
> request. Thus, [Cardentey's] constitutional claims
> raised for the first time on appeal about unanimous
> verdicts are not preserved, and the only timely and
> specific objection made by defense counsel to address
> on appeal is whether the reasoning of Starrett applies
> to this case. See Steinhorst v. State, 412 So.2d [332,]

338 [(Fla. 1982)].[9]

> The fact that <u>Starrett</u> is a federal case is of no consequence. "The Florida RICO statute was largely modeled after the Federal RICO Statute." <u>Gross v. State</u>, 765 So. 2d 39, 42 (Fla. 2000). "The 'enterprise' and 'pattern of racketeering activity' elements of RICO are almost identical to the Florida RICO provisions." <u>Id.</u> Furthermore, the Florida Supreme Court adopted the broader federal view of the definition of "enterprise." <u>See id.</u> at 45. Thus, the reasoning of <u>Starrett</u> applies equally here.

> In <u>Starrett</u>, the Eleventh Circuit examined a RICO Conspiracy count under the Federal RICO Act and stated: "The focus is on the agreement to participate in the enterprise through the pattern of racketeering activity, not on the agreement to commit the individual predicate acts." 55 F.3d at 1543 (11th Cir. 1995). Given this authority, and in the absence of any legal argument to the contrary, the trial court could not have been said to have abused its discretion in denying [Cardentey's] request for a special jury verdict here.

Resp. Ex. N at 54 (record citations omitted). In his reply brief, Petitioner simply relied on his initial brief on this issue. <u>See</u> Resp. Ex. O at 20 n.3. The First DCA per curiam affirmed without a written opinion. <u>See</u> Resp. Ex. P.

For purposes of this Order, the Court assumes the federal nature of this claim is exhausted. As such, the Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In

---

9 In <u>Steinhorst</u>, the Florida Supreme Court stated that "in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below." 412 So. 2d at 338.

doing so, the Court concludes, upon thorough review of the record and the applicable law, that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of such law, and was not based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to federal habeas relief on Ground Nine.

### J.    Ground Ten

Petitioner argues the cumulative effect of the errors in his case deprived him of a fair trial. Doc. 1 at 47-48. In his Rule 3.850 motion, Petitioner raised a similar claim of cumulative error pertaining solely to his ineffective assistance of trial counsel claims. Resp. Ex. T at 51. The trial court summarily denied relief as follows:

> Defendant asserts that this Court should assess the cumulative effect of the claimed errors when analyzing prejudice. "Claims of cumulative error do not warrant relief where each individual claim of error is either 'meritless, procedurally barred, or [does] not meet the Strickland standard for ineffective assistance of counsel.'" Schoenwetter v. State, 46 So. 3d 535, 562 (Fla. 2010) (quoting Israel v. State, 985 So. 2d 510, 520 (Fla. 2008)). Having found that all of Defendant's previous claims were meritless as failing to meet the Strickland standard of ineffective assistance of counsel, this Court finds Defendant is not entitled to relief due to alleged cumulative prejudice.

Resp. Ex. T at 388. The First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. X.

To the extent the state court adjudicated this claim on the merits, the Court addresses it in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. See 28 U.S.C. § 2254(d).

Nevertheless, even if the state court's adjudication is not entitled to deference, this claim must still be denied for the reasons that follow. As the United States Supreme Court has not yet held that distinct constitutional claims can be cumulated to grant habeas relief, the judgment of the state court cannot contravene § 2254(d). See, e.g. Wright v. Van Patten, 552 U.S. 120, 126 (2008) (per curiam) ("Because our cases give no clear answer to the question presented . . . , 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law."). However, even if the claim of cumulative error is cognizable for federal habeas review, it must still be denied because each individual claim that Petitioner raises is "either meritless, procedurally barred, or [does] not meet the Strickland standard for ineffective assistance of counsel." Schoenwetter, 46 So. 3d at 562; see also Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) ("We need not determine today whether, under the current state of Supreme Court precedent, cumulative error

claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law. For our purposes, it is enough to say that Morris's cumulative error claim clearly fails in light of the absence of any individual errors to accumulate."). Therefore, Ground Ten is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.    The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.    The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.    If Petitioner appeals the dismissal of this case, the Court denies a certificate of appealability.[10] Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the

---

[10] The Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Upon due consideration, the Court will deny a certificate of appealability.

pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 5th day of February, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

Jax-11 2/3

C:    Counsel of record